1              IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3    SPECTRE CORPORATION,                    )

4              Plaintiff,                    ) Case No.

5                   vs.                      ) 16-932C

6    THE UNITED STATES OF AMERICA,           )

7              Defendant.                    )

8

9

10                        Courtroom 7

11            Howard T. Markey National Courts Building

12                   717 Madison Place, N.W.

13                      Washington, D.C.

14                  Thursday, June 22, 2017

15                       2:00 p.m.

16                        Hearing

17

18

19

20            BEFORE: THE HONORABLE LOREN A. SMITH

21

22

23

24

25    Elizabeth M. Farrell, CERT, Digital Transcriptionist

2

Spectre Corporation v. USA                                6/22/2017

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3           CHRISTINA HEISCHMIDT, ESQ.

 4           Dunlap Bennett & Ludwig, PLLC

 5           8300 Boone Boulevard

 6           Suite 550

 7           Vienna, Virginia 22182

 8           (703) 777-7319 / (703) 777-3656 (fax)

 9           cheischmidt@dbllawyers.com

10           AND

11           JAMES WIGGIN, III, ESQ.

12           517 City Park Avenue

13           Columbus, OH 43215-0708

14           (614) 291-6424 / (614) 291-6424 (fax)

15           jameswwiggin@gmail.com

16   ON BEHALF OF THE DEFENDANT:

17           SHARI A. ROSE, ESQ.

18           ANDREW J. HUNTER, ESQ.

19           U.S. Department of Justice

20           Commercial Litigation Branch, Civil Division

21           Post Office Box 480

22           Ben Franklin Station

23           Washington, DC 20044

24           (202) 305-1265 / (202) 514-8624 (fax)

25           shari.rose@usdoj.gov
```

Spectre Corporation v. USA                                    6/22/2017

```
 1                   P R O C E E D I N G S
 2                 -    -    -    -    -
 3          (Proceedings called to order, 2:25 p.m.)
 4          THE COURT:  I apologize for the delay this
 5   afternoon, but we are here now in Spectre Corporation vs.
 6   the United States, and we're here on the Government's
 7   motion to dismiss the case.  Why don't we talk about the
 8   main motion and then we'll look at the issue of the sur-
 9   reply.
10          And for the Government, let me ask you to
11   introduce yourself first?
12          MS. ROSE:  Good afternoon, Your Honor.  My name
13   is Shari Rose, representing the United States in this
14   matter from the Department of Justice.  With me here at
15   the table is Andrew Hunter, also from the Department of
16   Justice, and we also have Callista Puchmeyer and James
17   Burke from NASA.
18          THE COURT:  Okay, good to have you all with us.
19          And from the Plaintiff's side?
20          MS. HEISCHMIDT:  Good afternoon, Your Honor.
21   Christina Heischmidt on behalf of Spectre Corporation.  I
22   am the attorney of record.  And with me today, I have
23   James Wiggin.  And, actually, we have a preliminary
24   matter on that --
25          THE COURT:  Okay.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

```
 1              MS. HEISCHMIDT:  -- as I understand --
 2              THE COURT:  Okay, I seem to remember, yes.
 3              MS. HEISCHMIDT:  So I was wondering if we could
 4    address that prior to arguing any motions.
 5              THE COURT:  Sure.  We have admission to the
 6    bar?
 7              MS. HEISCHMIDT:  So, Your Honor, there was
 8    actually an issue with that.  The certificate of good
 9    standing?
10              MR. WIGGIN:  I got a certificate of good
11    standing and it was mailed last week by the Ohio Supreme
12    Court, but it hasn't arrived.  I had it mailed to her
13    firm's office.
14              THE COURT:  Oh.
15              MR. WIGGIN:  As well as the check for the
16    admissions fee was being mailed.  We do have the letters
17    of recommendation and everything, but we are prepared
18    today to go ahead with that motion, and I have not yet
19    been admitted pro hac vice.
20              THE COURT:  Okay.  Well, is there any objection
21    to that?
22              MS. ROSE:  No, Your Honor.
23              THE COURT:  Okay.  Well, we'll admit you pro
24    hac vice for today, and next time you come, we'll have
25    your admission --
```

Spectre Corporation v. USA                          6/22/2017

 1            MS. HEISCHMIDT:  We're mailing them in, Your
 2   Honor.
 3            MR. WIGGIN:  We'll just submit it with the
 4   Clerk of Court.  We'll use their procedure.
 5            THE COURT:  Okay.
 6            MS. HEISCHMIDT:  Thank you very much.
 7            THE COURT:  Sounds good.
 8            MR. WIGGIN:  Now while I'm on my feet now that
 9   I'm admitted pro hac vice, Your Honor, the other motion
10   was I had filed a sur-reply.
11            THE COURT:  Yes.
12            MR. WIGGIN:  Peter Gwynne, who was the original
13   attorney for the Justice -- I talked about me of these
14   things with him and -- but anyway, when I filed the sur-
15   reply, he objected to that very much and he filed a
16   motion to strike.  And we fully briefed that, which is
17   the other motion that's up today.
18            THE COURT:  Correct.
19            MR. WIGGIN:  I notified counsel for the
20   Government yesterday -- I thought about it on the drive
21   out here and I thought there's really no need for my sur-
22   reply anymore since we're having oral argument.  Judge
23   Firestone had not shown any inclination to set it for
24   oral argument, so I want to have -- well, they accused me
25   of wanting to have the last word, which I guess I wanted

Spectre Corporation v. USA                                              6/22/2017

1   that.

2            THE COURT:  Okay.

3            MR. WIGGIN:  But it was -- I felt that there

4   were a few things I wanted to put on the record.  So as

5   interesting as some of the procedural issues in that

6   might be, I am -- we are prepared to withdraw that sur-

7   reply, which will moot the motion to strike and save you

8   a lot of time.

9            THE COURT:  Okay, thank you very much.  That

10  gets rid of something that I think would probably waste

11  time, because one of my philosophies is always in order

12  to help the judge understand the case, oral argument is

13  really very necessary and very useful.  And if someone

14  has something to say, I want to hear it.  So I don't -- I

15  think a lot of people want oral argument to go back and

16  forth and, you know, without any particular limit as

17  generally I've found that people don't abuse that.

18  People don't want to tell me things that have no

19  relevance to the case.  They generally want to make a

20  point.

21            And I've found our bar is pretty good.  They're

22  very -- they're not very often repetitive and -- so if

23  we've got anything to say, we'll hear it because,

24  obviously, that's the only way I can fairly decide the

25  case if I basically hear all the arguments and all the

1    points.  So we'll let everyone make their points,

2    withdraw -- that will clean up the docket a little bit,

3    withdrawing two motions, a sur-reply and then their

4    motion.  And -- now, of course, in this day and age, it

5    doesn't really make as much difference because it isn't

6    really on the docket; it's in an electronic cyber docket

7    (inaudible).

8             So, anyway, Ms. Rose, do you want to begin

9    since it's the Government's motion?

10            MS. ROSE:  Thank you, Your Honor.

11            May it please the Court.  The Court should

12   grant the Government's motion to dismiss because Spectre

13   has not and cannot state a claim upon which relief may be

14   granted.

15            There are three independent bases for granting

16   the Government's motion.  First, by its own admission,

17   Spectre has failed to meet its financial obligations

18   under the Space Act Agreement.  Because Spectre never

19   paid the full $80,000 due prior to the start of NASA's

20   work on Milestone 3, NASA had no obligation to perform

21   any activities under the contract after Milestone 2.

22            Second, the Space Act Agreement and Licensing

23   Agreement include express disclaimers of warranty and

24   liability and those express disclaimers preclude

25   Spectre's claim.  And, third, the Space Act Agreement and

Spectre Corporation v. USA                                          6/22/2017

```
 1    Licensing Agreement include express disclaimers of
 2    damages, which would preclude Spectre from any recovery.
 3    And I'd like to talk about each of those in a little bit
 4    more detail.
 5              I had the ELMO working before.  I'll see if I
 6    can do it again.
 7              THE COURT:  Okay.
 8              (Pause in the proceedings.)
 9              MS. ROSE:  This the Space Act Agreement, which
10    is Exhibit 2 to the complaint.  Within that, I wanted to
11    direct the Court's attention to Article 5, Financial
12    Obligations.  In this, the payment obligation schedule is
13    clearly delineated.  First, Spectre was required to pay
14    $100,000 prior to the initiation of any work and that
15    payment was made.  Next, Spectre was required to pay
16    $80,000 prior to the start of Milestone Number 3 and that
17    payment was not made in full.
18              At this point, I do need to correct one mistake
19    from the Government's briefing.  In our briefing, we
20    stated that Spectre's complaint acknowledged that it had
21    not paid -- that it had only paid $125,000 under the
22    Space Act Agreement.
23              THE COURT:  Yes.
24              MS. ROSE:  In fact, it had paid $165,000 under
25    the agreement.  And it takes some teasing out, but that
```

Spectre Corporation v. USA                                  6/22/2017

```
 1    is clearly acknowledged in the complaint and that $65,000

 2    payment is, of course, short of the full $80,000 payment

 3    that was the condition precedent before NASA was required

 4    to start any work with -- starting with Milestone 3.

 5              THE COURT:  So the first payment made in that

 6    list -- the first $80,000 was only $65,000?

 7              MS. ROSE:  Correct, correct.  And this is

 8    important because the allegations of breach are

 9    allegations of NASA's alleged failure to deliver sensors

10    under the contract, deliver information under the

11    contract, but none of NASA's deliverables were triggered

12    until Milestone 5 for information and Milestone 6 for

13    delivery of the first run of sensors.

14              THE COURT:  Hmm.  Well, here, I guess Milestone

15    3 is the first $80,000 and the second one -- Milestone 8

16    has to, I guess, go forward.

17              MS. ROSE:  Correct.  And there is no payment

18    after the $65,000 portion required prior to Milestone

19    Number 3.

20              THE COURT:  So there was no payment of

21    $100,000?

22              MS. ROSE:  There was the payment -- the initial

23    $100,000 and then 65 of the 80.

24              THE COURT:  Yeah.

25              MS. ROSE:  But that 165 represents the full
```

Spectre Corporation v. USA                                6/22/2017

1     amount of Spectre's payments and, again, because Spectre

2     was required to make these payments before -- before

3     NASA was required to perform the milestone activities, it

4     is -- it is a condition precedent and as their statement

5     says, without this activity being performed by Spectre,

6     the obligations were never triggered and NASA's

7     performance obligations were never due.

8              THE COURT:  Mm-hmm.

9              MS. ROSE:  I'd also like to talk a little bit

10    about the background of Space Act Agreements.  Spectre's

11    claim arises from its goal of using NASA's patented

12    technology for the manufacture and sale of high pressure

13    sensors.  And within NASA's jurisdiction, they have the

14    ability to enter into certain agreements, including Space

15    Act Agreements.  But there's a couple of different kinds

16    of agreements.

17             Here, this is the first page of Exhibit 2, the

18    first page of the Space Act Agreement.  This is clearly

19    labeled as a fully reimbursable Space Act Agreement.

20    That matters for a couple of reasons.  First, a fully

21    reimbursable Space Act Agreement is one that permits the

22    partner here, Spectre, to use NASA's goods, services,

23    facilities or equipment to advance the partner's own

24    interests.  It's not for NASA's mission objections.  It's

25    really to enable a private -- a private partner, like

Spectre Corporation v. USA                                    6/22/2017

1    Spectre, to use NASA's technology to further their own
2    interests.
3            And because they're using the technology to
4    further their own interests, there's a very specific
5    allocation of risks and the risk is placed on the partner
6    so that we don't have a situation like this here where
7    NASA is being -- facing challenges for damages.  And
8    there are a couple of different ways in which that's
9    articulated.
10           THE COURT:  Well, is that -- is there a real
11   contract here?  Is the Plaintiff getting anything?  It's
12   getting NASA's promise that if they want to perform, they
13   will.  It did remind me of a Monty Python episode where
14   the bishop has got this insurance policy and comes into
15   the sleazy insurance agency and he says, oh, I got a
16   claim.  And he says, no, you bought the no-claim policy.
17   It has this provision that any claim will be denied.  It
18   was a little cheaper, but you chose that one.  Is this --
19   I mean, is there anything that NASA could do that would
20   invoke liability?
21           MS. ROSE:  Yes.  The boundaries, however, are
22   limited to bad faith and willful misconduct or criminal
23   activity.  Short of that, there's -- the liability has
24   been -- has been waived by Spectre and warranties have
25   been disclaimed by NASA.  This is something that is made

Spectre Corporation v. USA                                    6/22/2017

1    known to parties who wish to enter into these Space Act

2    Agreements for their own profit, very much up-front.  The

3    briefing references and the complaint also references the

4    Space Act Agreement Guide and that Space Act Agreement

5    Guide clearly sets forth this allocation of risks.  And

6    the allocation of risks is going to be different

7    depending on what type of Space Act Agreement it is.

8           But where it is a fully reimbursable agreement

9    for the benefit of the partner, there is an unequal

10   allocation of risks and it is Spectre who bore the

11   risk --

12          THE COURT:  Well, would this risk mean that if

13   NASA decided -- I think in Plaintiff's brief, they used

14   the example of the blueberry muffins.  If NASA delivered

15   a tray of blueberry muffins, would that leave no

16   liability on NASA's part then?

17          MS. ROSE:  You know, I, again, think then you'd

18   have to ascertain whether that was -- represented good

19   faith efforts on NASA to perform under the contract.

20   Putting said blueberry muffins, we're dealing with, you

21   know, very sophisticated technology, things that are on

22   the cutting edge of technology.  To the extent that the

23   parties performed and what was delivered was something

24   that was not what Spectre wanted, but was the result of

25   the good faith efforts, then that would be --

Spectre Corporation v. USA                                    6/22/2017

1            THE COURT:  So there is a good faith effort
2     required.  So NASA could not just say, we're not
3     delivering anything.
4            MS. ROSE:  Right.
5            THE COURT:  They couldn't do that.
6            MS. ROSE:  That's right.
7            THE COURT:  That would make them liable for --
8     now, if they delivered something that was defective, that
9     would be a warranty issue and that would -- they would be
10    not liable for that, is that correct?
11           MS. ROSE:  Correct, I mean, absent some
12    evidence of --
13           THE COURT:  Bad faith.
14           MS. ROSE:  -- you know, willful and --
15           THE COURT:  Right.
16           MS. ROSE:  -- willful intent to make the
17    products defective.  And, here, although Plaintiffs used
18    the word "bad faith," we do not believe that there is
19    anything in their complaint that actually rises to the
20    level that would be required for a 12(b)(6) showing of
21    bad faith and, specifically, their allegations don't
22    demonstrate a specific intent by NASA to harm Spectre,
23    which would be required.
24           THE COURT:  Now, under the Government's
25    interpretation of the contract, it would appear that

Spectre Corporation v. USA                                    6/22/2017

1    NASA's appropriate legal right, at least, would have been

2    to do nothing until the money came in.  So there would be

3    no sensors delivered.  Though as I understand it from the

4    facts, there were three sensors or a question about the

5    effectiveness was also there, but there were some sensors

6    delivered.  Do you know why that occurred or is there --

7              MS. ROSE:  Yes.  I mean, NASA was undertaking

8    every effort to perform under the contract and that

9    included performing delivery of certain sensors that were

10   -- that they were able to create based on the funds that

11   had been transmitted by Spectre.  And we would note,

12   however, that NASA's continued performance is still -- is

13   still not yet due, even with those good faith efforts,

14   because there was no obligation of NASA to do anything

15   starting with Milestone 3 because that payment had not

16   yet -- had not ever been made.

17             THE COURT:  Okay.

18             MS. ROSE:  Within the Space Act Agreement,

19   Article 14 includes the disclaimer of warranty and

20   represents that -- it represents the agreement that

21   equipment, facilities, information and services

22   provided --

23             THE COURT:  Right.

24             MS. ROSE:  -- would be provided as is.  And it

25   also -- at the end of the paragraph is a disclaimer of

Spectre Corporation v. USA                                6/22/2017

```
1    damages.
2              THE COURT:  So a lot of -- that many times over
3    for -- in the various briefs.  So, yeah, I know all of
4    that.
5              MS. ROSE:  Okay.  And the licensing agreement
6    similarly contains very clear waivers of liability and
7    damages in the sections outlined in the briefs.
8              THE COURT:  But the licensing agreement
9    isn't -- the contention is that they've got -- the patent
10   or the agreement was terminated and no licensing was ever
11   done.
12             MS. ROSE:  Correct.
13             THE COURT:  Or no licensing by the company was
14   ever used to produce anything that produced profit.
15             MS. ROSE:  That's right.  The Space Act
16   Agreement expired by its own terms three years after it
17   was signed and the licensing agreement was terminated by
18   NASA.
19             THE COURT:  Okay.
20             MS. ROSE:  And unless the Court has further
21   questions at this point, I'll reserve any further
22   comments to be in response to the Plaintiff's.
23             THE COURT:  Okay, thank you, Ms. Rose.
24             Now, who is going to -- Mr. Wiggin, you're
25   going to --
```

Spectre Corporation v. USA                                    6/22/2017

1            MR. WIGGIN:  I will, Your Honor.

2            THE COURT:  Okay.  You may approach the podium

3    of your newly admitted to court.

4            MR. WIGGIN:  Thank you.  I didn't notice, do

5    they still call these Oscars or --

6            THE COURT:  They used to be called Elmos.

7            MR. WIGGIN:  Elmos, whatever they were.

8            THE COURT:  The Elmo.

9            MR. WIGGIN:  Elmos, that's right.  I didn't

10   know those were going to be available.  I do have -- I

11   did make copies of a few of the Space Act Agreement

12   articles for the Judge's --

13           THE COURT:  The "Oscar" one is all red and

14   fuzzy.

15           MR. WIGGIN:  And I'll hand them over to you and

16   I'll hand them -- if it would be useful for you to have

17   the --

18           THE COURT:  Yes, yes, it probably would.  Or

19   you can try putting it on the Elmo.

20           MR. WIGGIN:  Well, I made --

21           THE COURT:  I always get Elmo and Oscar

22   confused from my --

23           MR. WIGGIN:  -- I made copies for everybody.

24           THE COURT:  -- kids' TV watching years ago.

25           MR. WIGGIN:  Here's -- this is the entire --

Spectre Corporation v. USA                                    6/22/2017

1     this is the entire contract in case you want to flip
2     through that.
3                THE COURT:  Okay.
4                MR. WIGGIN:  I also have Article 2, which is
5     the purpose.
6                THE COURT:  Okay.
7                MR. WIGGIN:  Article 8, which I'm going to say
8     something about.
9                THE COURT:  Okay.
10               MR. WIGGIN:  And these -- yes, article -- the
11    termination clause, Article 18, and Article 14, the
12    famous disclaimer of warranty.  And I just made
13    individual copies of those so that we could --
14               THE COURT:  Okay.
15               MR. WIGGIN:  -- have them available.
16               THE COURT:  Okay, you may approach the bench,
17    sir.  Thank you.
18               Well, the first thing actually I'd like to
19    focus on is the money.
20               MR. WIGGIN:  Mm-hmm.
21               THE COURT:  I mean, is there any obligation on
22    the part of NASA to perform without the money?
23               MR. WIGGIN:  Well -- and I understand they
24    argue that these are conditions precedent and there is
25    one case they cite on that point -- I forget the name --

Spectre Corporation v. USA                                6/22/2017

1    although in that case, there was -- as I understand it,

2    there was one payment due which was an up-front payment

3    that was done as a condition precedent.  It hadn't been

4    made.  Pretty clear case.

5            I did want to mention that I drafted an

6    extraordinarily long complaint for me.  I'm usually more

7    succinct, but I did it for a couple of reasons.  One, I

8    wasn't really sure how the Iqbal doctrine is treated in

9    this Court.  But I also wanted to be sure that there were

10   -- knowing that the Justice Department was probably not

11   very familiar with what goes on over at NASA, I wanted

12   there to be lots of facts in there for them to take a

13   look at.  Since they haven't raised any Iqbal questions

14   or an issue, I will remind everybody that under 12(b)(6)

15   for purposes of this motion, all of the factual

16   allegations that are contained in that complaint are to

17   be taken as true by the Court.  The well pleaded factual

18   allegations --

19           THE COURT:  Correct.

20           MR. WIGGIN:  -- and I would hope that you'll

21   find most of them well pleaded.

22           As to the money issue, I wasn't intending to

23   address that until later on, but it's our position

24   that -- I mean, there's a few things that you should

25   know, first of all.  One, my client is a very small

Spectre Corporation v. USA                                    6/22/2017

1    business.  What's the relevance of that?  I mean, they

2    should be treated like any other business, I suppose,

3    except for the fact that as part of NASA's mission, when

4    it doles out these contracts, it's supposed to dole out

5    contracts to small businesses for the purpose of allowing

6    them to compete with bigger businesses and to grow

7    commerce, which was the State of Ohio's goal in having

8    this whole grant program that I'm going to be talking

9    about later that NASA says is completely beside the

10   point.

11           But just to put in context the monetary things

12   -- and I do maintain that to understand this case, you

13   have to look at the Space Act Agreement in the context of

14   the other agreements that were entered into.  The grant

15   agreement with the State of Ohio, which NASA -- they say,

16   well, we helped out Spectre in doing this.  But, in fact,

17   NASA -- Dr. Okojie, in his office, wanted to

18   commercialize this technology.  Now, the Government says

19   this is a gratuitous contract; NASA's really just doing

20   this for the benefit of Spectre.  That's not true.

21           NASA has been working on this technology since

22   at least the mid-1990s when it paid the -- it funded the

23   Ph.D. program for the scientist who was involved when he

24   was getting his Ph.D.  His Ph.D. research was devoted to

25   doing something for the benefit of NASA.  They then hired

Spectre Corporation v. USA                              6/22/2017

1    him after he got his Ph.D. and he has spent the previous
2    20 years working on this technology, mostly towards one
3    goal, which is to be able to provide to NASA high
4    temperature pressure gauges that they can use in their
5    rocket engines and their test stands and their jet
6    engines and their Mars rovers and their reentry vehicles,
7    all of which need to sense pressure at high temperatures.
8              THE COURT:  Yes.
9              MR. WIGGIN:  So NASA had -- if my client had
10   gone ahead and commercialized this technology, NASA would
11   have a seller to go to in order to buy pressure sensors.
12   It wouldn't have to make them for itself.  And there is
13   nobody out there that NASA can buy these things from.
14   Nobody.
15             So that was one sense in which this was not a
16   gratuitous program.  NASA joined with my client in making
17   this pitch to the State of Ohio for the grant money.
18   Now, my client couldn't have made that alone.  They had
19   to partner with another governmental entity or an
20   educational institution, and they partnered with NASA and
21   they partnered with the Lorain County Community College,
22   which was going to do some work study stuff to throw in
23   here.  But, basically, this whole thing was instigated by
24   NASA, as I alleged in the complaint.
25             NASA could not apply for the grant money

1    because the governmental entity involved could not apply.

2    It had to be a private business.

3            THE COURT:  Yes.

4            MR. WIGGIN:  And this grant was supposed to go

5    to small businesses and the State of Ohio was going to

6    help get them through what they called, in MBA talk --

7    there was all sorts of touchy-feely MBA stuff here, and

8    there was this valley of death that you have to get new

9    businesses from, entrepreneurial businesses because

10   that's when they usually fail.  And the State was going

11   to help my client get through that valley of death.

12           But what my client ran into -- because they

13   signed the agreement, NASA was a collaborator, and as a

14   collaborator, they signed on with a letter of intent

15   saying we will be a collaborator here.  They were

16   supposed to be a subcontractor.  They were supposed to be

17   an actual subcontractor like you'd see on a construction

18   project, but the Government -- the Federal Government

19   doesn't -- it doesn't act as a subcontractor.  So instead

20   of that -- instead of entering into a subcontract which

21   would have properly imposed contractual obligations on

22   NASA, it was run through my client's contract and were

23   actually owed to the State of Ohio.

24           Instead, NASA -- five months after the grant

25   was awarded, NASA got around to signing the Space Act

1     Agreement.  It took another five months to get the

2     license agreement signed.  And in the meantime, the State

3     of Ohio will only put out grant money on a reimbursable

4     basis.  So this whole thing is being delayed and Ms. Rose

5     said -- well, implied it was being delayed because my

6     client was delaying things.

7             My client had a factory of people that it had

8     just set up in Ohio after they moved their operations to

9     Ohio to hire Ohio employees.  They did that immediately

10    so they would be ready to go because Dr. Okojie at NASA

11    said, we'll get this off -- and the people in the

12    Technology Transfer Department at NASA said, we'll get

13    this off the ground, lift-off, once we get this grant

14    money.

15            And, instead, what they ran into were all these

16    bureaucratic delays because there had to be all sorts of

17    approvals and for the -- I mean, they couldn't do this

18    until they did that, they couldn't get -- license a

19    patent until they published it in the Federal Register

20    and went through a whole bunch of -- you know, giving the

21    public a right to object and say, no, license those

22    patents to me.  And so they were all sorts of delays.

23            And the other thing that we ran into was a huge

24    -- my little tiny client was placed in this horrible

25    position between two mammoth bureaucracies.  NASA, which

Spectre Corporation v. USA                                    6/22/2017

1    would only do anything if it got paid up-front, and the

2    State of Ohio, which would only disburse grant funds as

3    reimbursement for monies already spent on approved grant

4    purposes.

5            THE COURT:  Mm-hmm.

6            MR. WIGGIN:  So until this $100,000 could be

7    paid to NASA to get the thing off the ground, the State

8    of Ohio said, we're not going to give you that $100,000

9    up-front.  Now, they could have, but they didn't.  So

10   NASA said -- well, finally, NASA says, well -- and then

11   the State of Ohio says, not only that, we're not going to

12   sign a grant agreement with you until we know that NASA

13   is actually going to do this work that was in your

14   business plan that NASA signed on to under a contract and

15   that NASA is actually going to license this technology to

16   you.  Because we're not going to pay you a bunch of money

17   and then find out that NASA isn't going to give you the

18   technology.

19           So for months, the whole thing was in limbo

20   while my client kept employing these people, waiting for

21   this technology to get going.  Once NASA got the

22   $100,000, then it was like, oh, you know, we really can't

23   do anything for like four more months and, you know, the

24   contract says that you'll start to get stuff from us in

25   month three, but it's actually going to be -- and this

Spectre Corporation v. USA                                    6/22/2017

```
 1    was in April of 2012 -- it actually won't be until maybe
 2    January of 2013.  Then there were further delays from
 3    January 2013.  And Dr. Okojie, wait, wait, wait, there
 4    were more delays.  They were like, well, maybe you can
 5    talk to Okojie in four months.  When they finally get
 6    these things, they don't work.
 7              In the meantime, they've paid $100,000 to get
 8    the project off the ground; they've paid some more of the
 9    second payment that was due; and they're not getting
10    anything from NASA.  So is this an anticipatory breach?
11    Instead, NASA is saying, well, we know we haven't really
12    performed what we were supposed to perform up until this
13    point in time, but now we're getting into this point
14    where the next payment is due, $80,000 more.  And my
15    client, if you read the complaint, my client get anything
16    out of them.  They can't get Dr. Okojie to talk to them.
17              So I would say -- and when you talk about bad
18    faith, by the way, this contract is -- there are four
19    flavors of Space Act Agreements, four basic flavors.
20    This is one of the fully reimbursable Space Act
21    Agreements.  Well, that is the biggest misnomer in all of
22    federal bureaucracy because it's not fully reimbursable;
23    it has to all be paid ahead of time.
24              And after the grant agreement was assigned,
25    NASA said, well, what we'd really like is for you to pay
```

Spectre Corporation v. USA                                              6/22/2017

1    us the $468,000 up-front.  And my client said, pay the

2    $468,000?  My client, by the way, for every dollar that

3    it got in grant money, it had to spend two additional

4    dollars.  So to get the $500,000 to NASA that it was

5    going to get, that was all grant money.  All of that was

6    coming from the State of Ohio.  To get that $500,000, my

7    client had to spend a million dollars.

8            And, actually, since the State would only

9    disburse it on a reimbursed basis, to get that million --

10   to get the $500,000 to NASA, my client actually had to

11   spend a million and a half dollars.  $500,000 would be

12   reimbursed, so they'd net a million.  But of the $2

13   million that they had to spend to get the million,

14   $500,000 -- a million of that was attributed to this

15   $500,000 that had to go to NASA.

16           Now, this is fully reimbursable.  But if you

17   get into the regulations and NASA's a big --

18           THE COURT:  Let me just go back over this.

19           MR. WIGGIN:  I'm sorry.

20           THE COURT:  Ohio would not -- why would Ohio

21   not come up with the money?  I saw that Ohio was -- you

22   know, the Ohio agency or whatever it's called,

23   (inaudible) something -- it's suing now for, what,

24   $345,000.

25           MR. WIGGIN:  Under the grant agreement, my

Spectre Corporation v. USA                                    6/22/2017

1    client had the duty to account to Ohio for all of the --
2    wherever the grant money ended up being spent.
3              THE COURT:  Right.
4              MR. WIGGIN:  They had to account for it in
5    their books and records and they had to be able to
6    account for it with invoices to show that the money was
7    spent properly.  Now, unfortunately, because -- unlike a
8    lot of these grants where a grant is for just one little
9    specific purpose, this was for one specific purpose,
10   which was to commercialize NASA's technology.  But it
11   involved my client's entire operation because they were
12   already manufacturing what I would call Version 1, V.1,
13   pressure sensors which were silicon.
14             Oh, by the way, do you mind, Shari?  I've
15   showed you this.  I thought you might be curious about
16   this so I brought one of the things that was delivered by
17   NASA.  Do you mind if I show the Judge?  Whoops, I just
18   broke the water.  Anyway, what I'm handing you is is --
19             THE COURT:  Well, there's a disclaimer on it,
20   so you don't have to worry.
21             MR. WIGGIN:  That's what's called a sensor
22   module, Your Honor.  But if you look at the very end of
23   it, that little tiny, less-than-a-quarter-inch-square
24   thing that you see there is either one of the silicon
25   carbine dies --

Spectre Corporation v. USA                                      6/22/2017

1              THE COURT:  Yeah, it looks like --

2              MR. WIGGIN:  -- or it protects the die which is

3    underneath it.  But that's the size of the dies.  And

4    what it's mounted on there is what we call the header.

5              THE COURT:  This is a -- this thing here?

6              MR. WIGGIN:  What?

7              THE COURT:  The rod here?

8              MR. WIGGIN:  Well, yes, this up here --

9              THE COURT:  The header.

10             MR. WIGGIN:  And I'll be talking about this a

11   little later.  But one of the patents -- the second

12   patent that was licensed involved one thing only, one

13   technology only, which was it solved the big problem of

14   how do you mount the silicon carbide die, that little

15   delicate piece of rock --

16             THE COURT:  Right.  Yeah, this piece, right?

17             MR. WIGGIN:  Yes, so there's some -- how do you

18   mount that to a header and then expose that in a secure

19   enough way so that it's secure and it's airtight and

20   sealed, which it has to be for sensing pressure.  But the

21   problem you run into -- I know that you've probably seen

22   lots of intellectual property cases -- I don't know about

23   your engineering background.  But when you heat materials

24   up, materials all expand, and when you heat them up to

25   really high temperatures, they expand a lot more.

Spectre Corporation v. USA                          6/22/2017

1    Now, for each material, there's something called the
2    coefficient of expansion.  Different materials have
3    different coefficients.
4          Now, if you think of that die as a membrane say
5    with the head of a drum that over the rim of a drum --
6          THE COURT:  Right.
7          MR. WIGGIN:  -- if you think of the drum rim
8    expanding at a different rate than the -- if it expands
9    faster than the drum head, it can stretch it so tight
10   that it tears.  If it expands slower than the drum head,
11   the drum head can bubble up and get deformed.  So the big
12   secret that nobody could figure out is how do we mount
13   this once we have it on something that will be -- that
14   will not rupture or get damaged when they both get heated
15   up to 600 Celsius.
16         And that was the second patent.  So that's what
17   you have right there in your hand.  That was -- now,
18   these -- the way this contract read was that NASA would
19   be delivering between 36 and 60 of those as part of each
20   fabrication run.
21         THE COURT:  As just the top part or the whole
22   thing?
23         MR. WIGGIN:  That whole thing there.  And that
24   would go inside a housing made by my client who would be
25   connected to some circuit boards that were specially

Spectre Corporation v. USA                                    6/22/2017

1       engineered to translate the signal coming off of that

2       into intelligible information.  And for each application,

3       depending on where you put it to measure pressure, you

4       might have a different kind of housing.

5              My client already had a line of all this stuff

6       and under the business plan that was submitted by NASA

7       and my client to the State, NASA would produce those, my

8       client would engineer additional new circuit boards to

9       work with that technology and would put them in the --

10      substitute those in to make V.2, Version 2, 2.0 of my

11      client's product line with super space-age NASA

12      technology.

13             So the business plan was to move the factory,

14      hire Ohio workers, train them, put them to work making

15      the original product line, and wait for NASA to come up

16      with these things so we can start putting them into the

17      original product line, bringing investors in, demonstrate

18      them to investors.  We had people waiting in the wings to

19      invest money which would take care of all these

20      expenditures; show them to international distributors who

21      were going to pay fees to have the rights to market them;

22      show them to customers who were waiting to pay premium

23      prices just to get one of those in their hands so that

24      they could put it to work to save them a lot of money.

25             THE COURT:  Mm-hmm.

Spectre Corporation v. USA                                    6/22/2017

```
 1              MR. WIGGIN:  I forgot where I was going with
 2      that, but -- so as far as payment in advance, there were
 3      these big delays and --
 4              THE COURT:  Well, I mean, the story is of a
 5      complex nature.
 6              MR. WIGGIN:  Oh, you wanted to know about the
 7      accounting.  Well, what happened was as these delays kept
 8      going on and on and on, like the things that were
 9      supposed to be done with the money, some of it happened,
10      but some of it didn't happen because NASA hadn't
11      delivered.  So Lorain County Community College was
12      waiting for these things so it could start developing
13      some things with its students and doing some work.  It
14      was never able to do that stuff.
15              In the meantime, all of my client's overhead
16      was going on and on and on and on and they used some of
17      the money to keep all of that going, which I'm arguing
18      that the State of Ohio fulfilled the -- part of the --
19      most of the purpose of the grant, which was to hire Ohio
20      workers, earn Ohio taxable income, increase the tax base.
21              But when my client, who are some engineers and
22      they're really bad at accounting, and so when the state
23      auditor came to look at the books and records and spent a
24      day there, they had a hard time verifying much of
25      anything.  They wrote an audit report saying there's
```

Spectre Corporation v. USA                                6/22/2017

1     $348,000 that can't be accounted for, because my client
2     got about $900,000, by which time NASA pulled out and
3     said we're not doing anything anymore.
4              My client then made some further showing to
5     them and that number got adjusted downward and there
6     still is a lot unaccounted for, although actually other
7     than the fact that the money that should have been spent
8     for Lorain County Community College to do stuff and the
9     rest of the money that should have gone to NASA had
10    everything -- had NASA performed as it was supposed to
11    perform, that money was spent on other overhead and on --
12    because my client, in the meantime, has manufactured
13    about 15,000 of these sensors of its Version 1.0 and
14    shipped them out to customers and continued to make
15    money.  And so some of the money was going towards the
16    overhead for that endeavor.
17             And that's why I'm hoping to settle this by
18    proving to the State of Ohio that actually this was -- as
19    I say, it wasn't spent on cocaine and dancing girls,
20    which is what the auditor is usually looking for, or
21    gambling debts.  It was spent on legitimate purposes
22    although they were not quite the purposes that were in
23    the original budget.
24             THE COURT:  Mm-hmm.
25             MR. WIGGIN:  Now, the original budget was

Spectre Corporation v. USA                                    6/22/2017

```
 1    submitted way, way back before these contracts were
 2    entered into.  And by the time -- by the time that the
 3    grant was awarded, NASA was already talking about
 4    charging $85,000 more than their original estimate.  As I
 5    said, we didn't get the Space Act Agreement for months,
 6    months down the road and then didn't get the license
 7    agreement.  $50,000 of this money went to NASA for the
 8    license agreement.
 9              Now, they often -- they've announced -- you
10    know, they said to us, this is for the license, it has
11    nothing to do with our work, which I admit is true.
12              THE COURT:  Right.
13              MR. WIGGIN:  But on the other hand, it was
14    nonrefundable and it paid to get some patents that we
15    haven't benefitted from at all.  The other issue under
16    the license agreement was that we committed to pay $5,000
17    annual minimum royalties through 2025.  So -- but I did
18    discover, Your Honor, that in the NPD, which is the NASA
19    Policy Directive, which is one of the official things
20    they put out to enact their regulations under the
21    statutes, the NPD, which has been around forever, says to
22    NASA, when instructing NASA's people how to enter into
23    one of these fully reimbursable Space Act Agreement says,
24    you should always be paid up-front.
25              But if the party you're dealing with, your
```

1    partner, has to make a bunch of capital investments and

2    it would be a hardship to them to have to pay NASA ahead

3    of time for things, then you shall waive that agreement -

4    - that requirement.  You shall.  The language that it

5    uses in the policy directive is "you shall" waive that

6    requirement in order that undue hardship not be inflicted

7    on your business partner and that this whole project can

8    move forward.

9            Now, NASA -- you want to talk about bad

10   faith -- or not bad faith, lack of good faith, NASA's

11   contract negotiators never mentioned anything about that.

12   Instead, they said, we want $348,000 up front -- or

13   $438,000 up front.  What NASA did agree to break this

14   down a little into these -- into these phased payments,

15   but they said that's all you're getting and they never

16   bothered to mention, by the way, if this is going to be a

17   hardship on you, which obviously it would be because we

18   couldn't get the money from the State ahead of time --

19   but by the way, we can waive all this.  Because they knew

20   that they were going to get the money from the State, but

21   they never mentioned it.  And they certainly didn't put

22   it in effect.

23           And then they said over and over and over

24   again, despite the fact that they weren't delivering

25   anything, they said, by the way, when's our next payment

Spectre Corporation v. USA                                    6/22/2017

1    coming?  Now, my client wanted to know what in the world
2    did you do with the $100,000.  Because all they were
3    supposed to do in the first -- in these first few phases
4    -- the first phase was design.  They took the stuff --
5    and you can see this here in the -- it's in Article 3B
6    and it's mentioned in the purpose, by the way.  You can
7    see all these specs that are laid out.  Those were my
8    client's specs and it says right there -- I gave you --
9    it says right there --
10              THE COURT:  It's Article 3B?
11              MR. WIGGIN:  3B(1).  It's on page 3 of 17.
12              THE COURT:  Okay.
13              MR. WIGGIN:  It says right there this is the
14   first thing that NASA is supposed to do.  It says, "NASA
15   has reviewed and agreed upon the desired electrical and
16   physical characteristics supplied by Spectre."  Now, if
17   you go down to the end of that paragraph, you'll see in
18   all caps, "DESIRED ELECTRICAL PERFORMANCE."
19              THE COURT:  Yes.
20              MR. WIGGIN:  That's a head -- that should be a
21   heading.  But below that, down to 2, that's NASA's
22   summary of my client's total input into this contract.
23   All that my client put into this contract are those
24   specs.  And at the very beginning of that paragraph, it
25   says, "NASA has reviewed and agreed."  And what they

Spectre Corporation v. USA                              6/22/2017

1      agreed to was we can do this.  They agreed we will

2      engineer three different pressure centers to three

3      different -- one to 150 PSI, another to 500 PSI, and a

4      third to 1,000 PSI.  We will engineer and design those

5      three.

6              Now, we had every reason to expect they could

7      do that because Dr. Okojie had been working on this for

8      20 years.  And from time to time over the years, my

9      client had touched base with him and said, is this stuff

10     ready yet.  And it turned out it wasn't ready.  And so my

11     client, who was a little small guy, he couldn't do

12     anything.  He can't do millions of dollars of R&D.  But

13     the whole reason that they went forward with this is

14     because Dr. Okojie finally said, wow, we're ready to go

15     forward and here's this million-dollar grant program.  So

16     they applied for the thing and there was a business plan

17     that didn't say, well, NASA will try to do this and NASA

18     will use reasonable efforts to do this and NASA might not

19     be able to do this, and if it can't do this, too bad.

20             What NASA said to the State of Ohio was, we

21     will do this.  We will design these.  We'll figure out a

22     way to fabricate these.  We will make a certain number of

23     them to go forward with the business plan.  And after

24     that, we will teach Spectre how to do this so that they

25     can continue to do it themselves through 2025.

Spectre Corporation v. USA                                6/22/2017

1            And the State of Ohio had a company on board --
2      this is alleged in the complaint.  It was called Teratech
3      Corp.  And they were a bunch of engineers and specialists
4      and they had them on board to review all these
5      applications.  And when Teratech reviewed this
6      application, they had a ceramics engineer who knew this
7      stuff inside out.  He knew all about the efforts to try
8      to come up with a silicon carbide pressure sensor and he
9      submitted written questions that NASA had to respond to
10     and they had to get together a meeting where the
11     scientists from NASA came down and he had one question
12     for them.  Can you do this and will it really have zero
13     drift up to 300 Celsius?  That meant something to all
14     these people.  And what will the drift be up to 600
15     Celsius?
16           And NASA said, absolutely, we are firmly
17     committed to this, we are behind it and there is zero
18     drift up to 300 Celsius.  And the consultant who's being
19     paid by the State of Ohio to protect the State of Ohio
20     said, that's all I need to hear.  And he told the State
21     of Ohio this is one you should take because there's a
22     great prospect here.
23           So when we talk about this as being a research
24     and development project --
25           THE COURT:  Well, was he wrong on that?

```
 1            MR. WIGGIN:  Well --
 2            THE COURT:  I mean, was NASA able to do this?
 3            MR. WIGGIN:  Your Honor, I don't really know
 4    because -- and it's alleged in the complaint, all we ever
 5    got after many delays, after the $100,000 had been paid,
 6    after more of the second payment had been paid and after
 7    a whole lot of delays and a whole lot of hemming and
 8    hawing, all we got were three of those.  Dr. Okojie said,
 9    well, I'll send you four.  I've got two I'll go ahead and
10    send you and I have another two I'll send you, but he
11    ended up only sending one more.  And they were all
12    supposed to be 1,000 PSI.  One of them was broken.
13            Now, Dr. Okojie is only -- he's four minutes --
14    he's only four miles away from Spectre.  They're at the
15    Cleveland Airport.  And my client's west of there.  They
16    just had to deliver this four miles.  One of them was
17    broken, it didn't work at all.  That was confirmed.  The
18    other two, one of them was 1,000 PSI.  It tested out to
19    that.  The other one tested out to 500 PSI.  It was
20    supposed to be 1,000, but it was 500.  Dr. Okojie said,
21    this is really interesting.  We measured this and it
22    turned out to be 500.  Hmm, I wonder why.
23            Well, my client then tests -- tried to test
24    these things and get them to work right.  Never could.
25    Couldn't get them to work right.  Dr. Okojie sent some
```

1    little graphs and said, here are all our test results.

2    My client could never get them to work right.  The first

3    thing he said was, well, you guys don't know what you're

4    doing.  And they said, well, come on down and -- come on

5    over some afternoon and show us as soon as possible.  Ah,

6    I can't do that.  Come on over and we'll show you how

7    we're testing this.  Oh, I can't do that.

8            Well, my client has taken these things to the

9    experts.  They've confirmed that my client is doing it

10   right.  In the meantime, my client has manufactured and

11   shipped 15,000 of these things.  Every one of them has to

12   be tested.  Every one of them has to be custom -- they

13   calibrate them because each one performs a little

14   differently.  Every one of them has to be calibrated

15   before they're sent out.  My client does all that stuff.

16   So we're fully prepared to go forward and prove that,

17   yes, we did know what we were doing.

18           Now, why would Dr. Okojie say, well, I don't

19   know, there's nothing wrong with these?  But they had no

20   more to deliver.  We're like where are all -- where are

21   the hundreds of spare dies that we should have -- I mean,

22   loose dies off the wafer, because they make them one

23   wafer at a time, like this big.  There's maybe 400 of

24   those.  That's what the first patent is all about.  The

25   first patent is how do you bulk manufacture hundreds of

1    these at a time.

2         That's the other thing we licensed, was you

3    show us how to do this, Dr. Okojie, you show us how to do

4    this, and this contract -- the license agreement -- NASA

5    didn't do -- all NASA does is license.  That's all they

6    have to do under the license agreement.  They didn't have

7    to teach anything.  But under the Space Act Agreement,

8    they were supposed to transfer the technology.  Now, this

9    is something they do all the time.  And I'll show -- you

10   know, we'll go over the -- the language in here says that

11   NASA will get all this data together, do everything that

12   -- as necessary to allow Spectre or its vendors to

13   replicate these three sensors that we have designed and

14   engineered for you.

15        And my client said, well, let us come in and

16   videotape this stuff -- that's what you usually do with

17   something like this -- while you're making it.  They

18   said, ahhh, we can't have you in to videotape it, it's a

19   secret, we're licensing it.  They said, we'll tell you

20   what, you won't let us in to videotape it or observe --

21   well, let's come in to observe.  Ahhh, we can't let you

22   do that.  Well, then have one of your people videotape it

23   and give us the videotape.  Ahhh, we can't do that.

24        Well, I suspect -- this is what I suspect and I

25   think the discovery is going to show this because it was

Spectre Corporation v. USA                                    6/22/2017

1    written in the complaint, what eventually happened here
2    was that one day after my client had complained to the
3    NASA Inspector General and supposedly was going to have a
4    confidential investigation done about my client's
5    complaints about why nothing was happening despite how
6    much money they spent and why are we getting all these
7    lies.  That Inspector General -- assistant whatever he's
8    called, he went right off to NASA's headquarters and he
9    told the management at NASA Glenn about these
10   allegations.
11           And so, all of a sudden, Ms. Rose's predecessor
12   -- actually, Ms. Puchmeyer's predecessor out there at
13   NASA, they started having phone calls and meetings and my
14   client's like, well, thank God, finally we're going to
15   have this meeting where we'll sit down with Dr. Okojie
16   and we'll figure out what's wrong here, because my client
17   still thinks that he's going to get this to work because
18   he has so much invested in it.  Instead, counsel for NASA
19   says, oh, no, we're not going to have that kind of
20   meeting, we're going to have a meeting where we talk
21   about what's going to happen with this contract.
22           So when they finally get together, he's got two
23   things.  He's got a check for -- actually, my client paid
24   $170,000 under the Space Act Agreement, but NASA refunded
25   $5,000 for -- I forget the reason, but they said, well,

1    we don't -- we owe this back, you paid us too much, and
2    then there was $50,000 under the license agreement.  So
3    he's got two things.  He's got a check for $215,000 in
4    his hand, which is all the money that's been paid and
5    he's got a mutual termination agreement which says, sign
6    this, we're terminating the contract, and you release
7    NASA from any further liability for anything here.
8              Now, I've been around federal contracts and
9    federal agencies to -- I mean, I don't know if this is
10   what happened, but federal agencies don't normally do
11   this.  In all of these contracts -- in fact, if you look
12   at the termination clause here, which we're going to look
13   at later, you'll see that it says if NASA terminates this
14   contract, we don't have to give you anything back.  We
15   don't have to give you anything regardless of what you
16   got out of us.  Ms. Rose was -- she seemed to be kind of
17   proud to tell you about that.
18             But at any rate, it's very unusual for a
19   federal agency who doesn't have to -- NASA does say, in
20   their discretion, if there's some costs that maybe should
21   be reimbursed, we might think about doing that.  But in
22   my experience -- and you've heard a lot of these cases
23   for 32 years, I'm sure -- it's very rare for a federal
24   agency to come forward and say, here's a complete refund
25   for all the money that you've paid to us.  Now, that

1    suggests to me that counsel for NASA, in looking into

2    these complaints that my client had, found out that there

3    was something very bad going on inside those labs.

4           Now, I think, frankly, we had to plead this as

5    a breach of contract case, but I think because we

6    can't -- we can't sue the Government for fraud unless I

7    go for a private bill in Congress, which I thought about

8    doing, but I think that it's quite possible that what

9    happened here was fraud.  I think we are going to find

10   out that Dr. Okojie never fabricated a wafer, never

11   designed any of these specifically for my client, and

12   that when he -- and that, in all likelihood -- he never

13   numbered them as they were supposed to be numbered, but

14   in all likelihood, when he finally delivered these three,

15   one of which was broken and two of which didn't work,

16   they were some things that were just sitting around the

17   lab for some other customer of NASA that they had been

18   working with.

19          THE COURT:  Well, if that was the case, if

20   there was no workable whatever these things are called,

21   the --

22          MR. WIGGIN:  Pressure sensors.

23          THE COURT:  Pressure sensors, then shouldn't

24   you be asking for restitution, all the monies paid,

25   putting everyone back in the position they were in before

Spectre Corporation v. USA                                    6/22/2017

1    the contract was ever entered?

2              MR. WIGGIN:  Shouldn't I be?

3              THE COURT:  That seems like a -- yes, shouldn't

4    --

5              MR. WIGGIN:  I am.  I am asking for the

6    $215,000 back.

7              THE COURT:  It's a total failure -- in order to

8    do that, the Court would have to find a total failure of

9    the purpose of the contract and everyone would be put in

10   the position they were before they met.

11             MR. WIGGIN:  I'm not sure.  I mean, the measure

12   of damages here -- I mean, I would contend -- and I said

13   this in the response brief -- that this issue of payments

14   is a real issue of fact because --

15             THE COURT:  Right, and --

16             MR. WIGGIN:  And counsel may not have known

17   this because I know that they -- they're not NASA's

18   counsel and they don't know what happened.  But that, in

19   fact, there had been lots of conversations with NASA's

20   people when the State of Ohio was -- and they said, well,

21   if you could just get us $20,000, if you could just get

22   us that.

23             But the final $25,000, by the way, Dr. Okojie

24   called up and said, you know, I've got the rest of the

25   sensors that I owe you, the rest of the 1,000 PSI sensors

Spectre Corporation v. USA                                    6/22/2017

1    and so my clients, they -- my client said, well, don't do
2    the 150s and 500s until we have this worked out because
3    we still haven't seen that you're actually making
4    anything that works.  He said, well, I have the rest of
5    the 1000s, and there should have been between 36 and 60.
6    So he had already loaded three, so there should have been
7    like -- no, I'm sorry, 12 -- one-third of that, 12 and
8    20.  He delivered three.  There should have been 9 to 17
9    of them.
10             THE COURT:  Mm-hmm.
11             MR. WIGGIN:  And instead we got six.  He said
12   if you could just pay the $25,000, then I'll deliver the
13   rest of these.  So they paid another $25,000, even though
14   they had not been shown that anything was being done.
15   And they thought, well, at least we'll get the rest of
16   the 1000s, and they got six.  And when they tested them,
17   they were only good to 200.  And they emailed Dr. Okojie
18   and they said, well, what are these rated at?  We only
19   can test them to 200.  He's like, yeah, they're 200.
20   Well, 200 wasn't even in the contract.  And that was when
21   my client completely blew his top and went to the
22   Inspector General and said, something weird is going on
23   here.
24             THE COURT:  Mm-hmm.
25             MR. WIGGIN:  So I don't know.  That seemed like

Spectre Corporation v. USA                                    6/22/2017

1     fraud in the inducement.  But what we are alleging -- and
2     the reason I think that we have a right to get all of our
3     damages here -- is that NASA gave -- when counsel
4     tendered the $215,000 and the mutual termination
5     agreement, my client said, well, hold on here, you've got
6     this deadline we have to accept by; I don't have a
7     lawyer; I need to talk to the State of Ohio because I'm
8     worried about my obligations to them.  And I can't just
9     release -- I mean, they were supposed to be a
10    subcontractor.  I can't just release you from this
11    without worrying about what the State of Ohio is going to
12    say about that.
13              THE COURT:  Mm-hmm.
14              MR. WIGGIN:  So he tried to talk to the State
15    and then the State was like -- you know, it was hard to
16    get them to do anything.  And they're like, can't you
17    talk to NASA and say, just slow this down, hold this off
18    a bit until we can have a big meeting.  And they said,
19    well, we'll try to have a meeting.  And my client said,
20    well, don't have a meeting without us because he didn't
21    want them to meet with -- the State with NASA because for
22    all he -- he knew what Dr. Okojie was going to tell them.
23    We've done everything right and these people just don't
24    know what they're doing, they can't test them.
25              Well, in fact, the State of Ohio went ahead and

Spectre Corporation v. USA                                      6/22/2017

1    had a meeting with -- well, it was a conference call --

2    with NASA, didn't include my client, and afterwards said,

3    we've heard all we need to hear, you're going to have to

4    deal with this problem, we're not involved.  At that

5    point, the deadline came and went.  My client did talk to

6    a lawyer who tried and said, well, maybe you should take

7    the money, because I think most lawyers that have ever

8    tried to sue the Federal Government would say, geez, if

9    the Government is trying to give you all your money back,

10   maybe you should take that and run.  But -- so they

11   called NASA and NASA said, too late, we're not going to

12   give it back to you.

13          But at that point -- I mean, this was in April

14   of 2014.  At that point, NASA said, we're not performing

15   further.  We're not performing further.  We're not going

16   to perform this contract for you.  We don't care if you

17   give us more money, we're not performing it further.  And

18   so they just waited it out until the contract terminated

19   in -- I think it was in December, in December of 2014.

20   Seven more months they did absolutely nothing.

21          And so my position is that it didn't really

22   matter.  They would say more -- you know, conditions

23   precedent -- precedent were not satisfied.  We think

24   we're going to prove that we paid more money than we ever

25   should have paid to them because by the time you got into

Spectre Corporation v. USA                          6/22/2017

1    the second payment -- and you were asking about this, so

2    I'll point out something sort of interesting.  If you'll

3    turn to page 6, which Ms. Rose showed you, the financial

4    -- Article 5, the Financial Obligations.

5              THE COURT:  Yes.

6              MR. WIGGIN:  Now, notice that the first one,

7    Milestone 3, you pointed out, it says, $80,000 prior to

8    the start of Milestone 3.  Well, it's sort of hard to

9    figure out exactly what that means because if you turn

10   back a page, you'll see that Milestone 3 is defined as

11   NASA completes sensing element test.  So the payment is

12   to be made before the start of something, but the

13   something that they're talking about is actually the end

14   of something.  Okay?

15             Presumably, if you look at these descriptions

16   here, the first thing they're going to do once they get

17   the $100,000 is 1 and 2.  They're going to design the

18   wafers, they're going to complete the design, and they're

19   going to actually fabricate them.  They're going to take

20   these silicon carbide disks, they're going to put --

21   they're going to build up the circuitry inside of a dome

22   with all sorts of high energy and stuff.  They're going

23   to build up the circuitry on the front end, they're going

24   to flip it over, they're going to etch out the diaphragms

25   on the back end for hundreds of these at a time.  That's

1    all supposed to be done by the end of the third month

2    from the signing, Milestone 2.  So that's included within

3    the 100,000 bucks.  Makes sense.

4            Milestone 3 is supposed to be concluded -- and

5    Milestone 4, by the way -- are both supposed to conclude

6    two months later at the end of month five.  So where it

7    says payment before the start of Milestone 3, it might as

8    well say, "and Milestone 5," because they're supposed to

9    take the same amount of time.  But that is -- Milestone 3

10   is complete sensing -- sensing the elements, and that's

11   they're going to test each one of those 100s and they're

12   going to figure out which ones don't work, get rid of

13   those and take the ones that work and get a bunch of them

14   mounted on the -- mounted on the header.

15           THE COURT:  Mm-hmm.

16           MR. WIGGIN:  That's "complete the sensing

17   test."  Number 4 is complete the header fabrication.  So

18   that was supposed to all be done by the time the next

19   $80,000 got paid.

20           THE COURT:  Mm-hmm.

21           MR. WIGGIN:  Now, we didn't have any evidence,

22   at the time we made the payment, I don't believe, I might

23   be wrong about this, but we didn't have any evidence that

24   any of it had been done because nothing had been

25   delivered.  And, yet, they went ahead and they started

Spectre Corporation v. USA                                    6/22/2017

    1    making these payments.  And at that point, you know,
    2    you're supposed to be in to Numbers 5 and 6, which is
    3    covered by that $80,000, and that's all -- those are all
    4    supposed to be completed one month from then.  It's just
    5    a little additional testing.
    6            And then 6 is just putting these things in a
    7    box and delivering them four miles down the road.  That's
    8    Number 6.
    9            THE COURT:  Mm-hmm.
   10            MR. WIGGIN:  Because once Number 5 was
   11    completed, they're tested, everything's supposed to be
   12    delivered.  So most of that second payment had been made
   13    and none of this had been received.
   14            So my position is is that NASA had already
   15    breached the contract.  NASA had breached the contract.
   16    There was not any -- they hadn't proved that they were
   17    entitled to any of the money that they had received yet.
   18    And they're asking for more money before they'll do
   19    anything.  And then they come into court and they say,
   20    well, you're entitled to anything because you didn't make
   21    all these additional payments of 300,000 more dollars.
   22            Well, Judge, because in the meantime there was
   23    more and more and more delay and then they show up with a
   24    check saying, here's your money back, we're not doing
   25    anything more.  That's anticipatory breach of contract,

                            For The Record, Inc.
                (301) 870-8025 - www.ftrinc.net - (800) 921-5555

Spectre Corporation v. USA                               6/22/2017

1    repudiation of the contract.  So at that point, what were

2    we supposed to do?  Were we supposed to write a check for

3    $368,000 and say, well, here, here's the rest of our

4    money?  Hopefully, the State of Ohio will reimburse us

5    for this.  We don't know if you're going to do anything;

6    you said you wouldn't.

7                THE COURT:  Yeah.

8                MR. WIGGIN:  So that's -- and I think there's a

9    bunch of factual issues in there.  They had agreed to

10   certain things.  And I just don't think that you can

11   decide that issue on a 12(b)(6) motion.

12               THE COURT:  Okay.

13               MR. WIGGIN:  Now, the Court -- they said I pled

14   myself out of court by saying, well, this one payment was

15   made, but that was really just to establish something in

16   time.  Okay.

17               THE COURT:  Okay.

18               MR. WIGGIN:  That was probably more than you

19   wanted to hear, but, hopefully, that answers the question

20   of what I had to say about the payments.

21               THE COURT:  Okay.

22               MR. WIGGIN:  Okay.  Obviously, I'm a little

23   outraged by all this.  The Government has said this case

24   should be dismissed because of the boilerplate in our

25   contract.  Now, remember, this contract -- we didn't have

Spectre Corporation v. USA                                    6/22/2017

1    this contract for seven months after the grant was
2    awarded.  They said, well, we don't have anything to do
3    with the grant, even though all the money was coming from
4    the grant to pay them.  But these terms got agreed to
5    months and months and months after we were already
6    obligated to the State of Ohio under all these things.
7    It should have been a subcontract, but they -- the
8    Government wouldn't do that.
9          They then say -- so there are these limitations
10   that we didn't promise anything to you at all.  Now, I'm
11   really glad that you picked up on the blueberry muffin
12   thing because the other part of that -- and I think
13   that's a decent response.  We should have rejected it for
14   improper tender.  And I think that -- maybe that's what
15   happens because usually when you're talking about
16   warranties -- how I've always thought about warranties is
17   that a warranty is something that usually applies to
18   future performance.  It's going to continue to do this
19   for a certain amount of time.  It will have these
20   characteristics that you can rely upon.
21         And the warranty is usually something that
22   kicks in after there's been a tender of delivery under a
23   purchase contract and the buyer has a right to inspect
24   the goods that have been delivered, tendered, to see
25   whether they conform or not to the contract.

Spectre Corporation v. USA                                6/22/2017

```
 1                THE COURT:  Mm-hmm.
 2                MR. WIGGIN:  Okay?  So we should have been
 3     getting dozens of these sensors that were mounted like
 4     that and could have immediately been sent out and shown
 5     to our customers, yes, this stuff works, this isn't a
 6     dream, it actually works, the future is here.  And we
 7     should have been able to -- we should have hundreds of
 8     more of those, of the loose dies, that we could have used
 9     to have Lorain County Community College start to mount
10     them on more of the headers that were being manufactured.
11                Now, one thing I haven't mentioned yet -- it's
12     in the complaint -- I said that that second patent was
13     all about mounting those things.  Now, it turns out -- so
14     the whole reason we were licensing the second patent was
15     to find out how to do that, the secret of doing that.
16     And when this contract was first tendered to us by NASA's
17     lawyers, if you will turn to page 4 of 17, Number 5 --
18     that's Activity Number 5.  Now, this is after all of the
19     dies have been made, the hundreds of them, and this is
20     when you start to mount these things.
21                It says -- oh, I'm sorry, I meant paragraph 4.
22     It says, "NASA will fabricate ceramic headers."
23                THE COURT:  Where is this?  What page?
24                MR. WIGGIN:  On page 4 of the contract.
25                THE COURT:  Okay.
```

Spectre Corporation v. USA                                      6/22/2017

1          MR. WIGGIN:  These are all the things NASA says
2    they will do, okay?  This is NASA's part of the
3    performances.  Number 4 is header fabrication and
4    assembly.  You've got that right in front of you.  "NASA
5    will fabricate ceramic headers to the specifications
6    listed in Table 1 above," and then they're going to
7    attach the sensors to the headers.  The next sentence
8    says, "The header fabrication and attachment of sensors
9    to the headers will be performed by Sienna Technologies,
10   Woodinville, Washington, at NASA's expense, under NASA's
11   direction."
12          Now, my client had never heard of Sienna
13   Technologies.  Here we are seven months after the grant
14   was awarded, going on a year after we first started
15   talking about this, we had never heard of Sienna
16   Technologies.  This is the whole second patent.  And my
17   client assumed, well, Sienna Technologies is a
18   subcontractor.  NASA's going to -- they're going to
19   design these things and they're going to -- and then
20   they're going to farm out manufacturing them and mounting
21   these things to a subcontractor.  And that's -- that, in
22   fact, is what happened.  The next paragraph says, "They
23   will be delivered back to NASA by Sienna Technologies."
24   Okay?
25          Well, during -- after this was all signed and

1   after my client paid a bunch of money to them, we got

2   into the part of the contract where the technologies

3   transferred, okay?  And we never did get any instructions

4   or specifications for these headers.  They never told us

5   what the dimensions were, what the designs were, what

6   materials they were made out of, never got any of that.

7   We never got that from Dr. Okojie.

8           And he said, you're going to have to just

9   figure this out yourself.  We're like, we paid you for

10  the patent, we paid you for it.  He said, you're going to

11  have to figure it out yourself.  And they said, well, at

12  least tell us what the paste is, the conductive paste is.

13  The paste is -- the die is glued down with something

14  called paste, which will cure and it can withstand high

15  temperatures.

16          This is a very special thing because, again,

17  this is something that supposedly Dr. Okojie discovered

18  and he got issued a patent for.  And we would -- this was

19  what -- the biggest secret we needed to know is what is

20  that paste, what is that magic substance that holds these

21  things together so when you heat them up to a high

22  temperature, they don't rip apart.

23          THE COURT:  Well, wasn't it disclosed in the

24  patent?

25          MR. WIGGIN:  It was disclosed that you have to

1    use a paste --

2              THE COURT:  Oh.

3              MR. WIGGIN:   -- as part of the method because

4    it was a method --

5              THE COURT:  The formula for the paste was not

6    disclosed?

7              MR. WIGGIN:  No, no.

8              THE COURT:  That was not part of the patent.

9              MR. WIGGIN:  It says a conductive paste.  It

10   was part of the method, because this is a method patent.

11   It says, do this, do this, do this, here's the design,

12   look at these pictures, do this and do this.  So that's

13   why we -- when -- essentially, when he went about

14   pretending to transfer the technology, he always treated

15   this under the -- and he's an inventor, he has more

16   patents than this that NASA now holds, a bunch of them.

17             But he's very familiar with patent law, I

18   guess, and he really treated this as the sort of

19   disclosure of the art that's necessary as a precondition

20   to be issuing a patent, which I'm sure you're aware

21   means, you know, you have to show enough of the

22   technology to enable the -- to comply with the statute

23   and say, okay, this is specific enough for disclosure for

24   us to issue it.  His idea was that's the minimum.

25             Now, NASA, since they wanted these sensors and

Spectre Corporation v. USA                              6/22/2017

1    it was going to make money off of this, we think $15
2    million through 2025, they should have been head over
3    heels saying, what more information do you need, what can
4    we do to help, how can we make this happen fast?  And
5    instead it was like, well, I'm not giving you that
6    information, you'll have to figure it out on your own.
7              We asked, well, what about the masks for doing
8    this -- masks when it was etched from behind, when
9    circuits are deposited with ions on the front, all of
10   that is accomplished with masks.  Several layers of masks
11   on the front, one on the back.  You know, masks are like
12   stem cells.  You know, in grade school that you used to
13   write your name, plastic stencils.
14             THE COURT:  Yes.
15             MR. WIGGIN:  They're like that except that
16   these are on a microscopic level.  You can't see them
17   with the human eye.  And this is not a complicated
18   circuit.  It's essentially an H.  The (inaudible) bridge
19   is an H.  The patent on the back is an annulus, like the
20   target symbol.
21             THE COURT:  Yes.
22             MR. WIGGIN:  But -- so the masks are not
23   complicated geometrically.  And you make those and then
24   you use -- a computer program makes them and then you
25   replicate 400 of them on the disk for one big mask that

Spectre Corporation v. USA                                    6/22/2017

1    has all those little ones.  My client said, well, where
2    are the masks, when are you going to transfer those to
3    us?  Because the contract says they will record the
4    masks.  They will record all the data they use and
5    they'll provide it as necessary and required to allow us
6    to make this stuff.  Dr. Okojie said, well, you don't get
7    the masks.  The contract doesn't say you get the masks.
8           And we then pointed out, the contract says you
9    will record the masks and you will provide all this
10   stuff.  And he says, oh, yes, well, the contract says
11   I'll record the masks, but it doesn't say I'll give it to
12   you.  I mean, if you want to talk about lack of bad
13   faith...
14          So -- where was I going with all that?  At any
15   rate, the technology transfer, we never got to the point
16   -- and we were finally told when we said, okay, we've got
17   to make these things ourselves.  Well, at least if we
18   have to design this ourselves, what was the conductor
19   pace?  We really need to know that.  At that time, they
20   were told, these headers, the materials used in them and
21   the conductive paste, are all the proprietary trade
22   secret information of Sienna Technologies and you can't
23   have it.
24          We paid for this patent and as part of this --
25   it wasn't just because we paid for it because we were

1    willing to go spend millions of dollars of research and

2    development to figure out how to do it ourselves, we paid

3    for the patent and for the technology transfer in order

4    that this -- all of this could be taught to us.  Not the

5    teaching that occurs through reading the claims of a

6    patent, but the teaching that occurs by somebody who

7    actually knows how to practice the patent and has

8    perfected and done all the research and development and

9    says, it's ready for commercialization, it's ready to be

10   manufactured and sent to market, and that's what they

11   told us.

12          So when they point at the -- as NASA's attorney

13   did when he wrote the final agency decision, when they

14   look at the first sentence of Article 2 -- and I gave you

15   a copy of Article 2 -- the first sentence -- and this is

16   part of their boilerplate, you know.  "The purpose of the

17   Space Act Agreement is to" blank, fill in what you say

18   the purpose is.  And they filled that in.  And that is

19   inconsistent with the business plan that they submitted

20   to the State of Ohio.

21          What was submitted was commercialization.

22   We're going to put these things on the market and we're

23   going to sell it to people and make a bunch of money, not

24   we're going to determine whether it's worth putting

25   additional money in for additional research and

1    development over the next several years in the hopes that

2    maybe we'll discover how to make it.  And they told the

3    State of Ohio's consultants that, too.  We know how to

4    make it.

5            So my clients, who were not represented by

6    counsel and who basically had this document -- by the

7    way, these contracts are in a computer.  They actually

8    have all of -- they said in the brief -- and I know Ms.

9    Rose didn't write the brief -- they said in the brief,

10   oh, the Spectre calls this boilerplate.  It is

11   boilerplate.  They have -- all of these -- almost every

12   single word that you read in this contract, every chunk

13   of it, is in their manual for how to put these things

14   together.

15           They took their manual and they put their

16   manual into their database -- and I suppose they have

17   some -- a software interface where they can plug them all

18   together and that software also is called SAAM, the Space

19   Act Agreement Maker.  That software also tracks all of

20   these steps required by the regulations and their own

21   internal procedures for putting together one of these

22   contracts and reviewing it and approving it and all that

23   stuff.

24           And then I think -- this is what the NASA

25   publication says.  So if I'm wrong about this, I hope

Spectre Corporation v. USA                        6/22/2017

1   you'll tell me about it sometime.  But at the end of the
2   day, they also store the finished agreements in there.
3   So they have -- all of this stuff is -- and what you have
4   before you, these are all -- with the exception of a few
5   little words that were put into it to put my client's
6   name in and put in a purpose and these specs and the
7   dollar amounts, everything else is standard language with
8   blanks in it to put those things in.
9           THE COURT:  Right.
10          MR. WIGGIN:  And this contract was put in front
11  of my clients and basically they said take it or leave
12  it, which you could -- that's what the Federal Government
13  does.
14          So my client didn't really appreciate that some
15  day somebody was going to show up and stand up in court
16  and say, Your Honor, we never said we'd actually make
17  these things or actually design them or actually
18  fabricate them and give them to them; we said we'd try to
19  do this, and it was all for the purpose of figuring out
20  whether it was worth going forward.  We'll take a half
21  million dollars plus $50,000 under the patent agreement,
22  but we never said that we could actually do anything with
23  any of this.
24          So I've got some questions that I think you
25  should ask yourself, the trier of fact someday will ask

Spectre Corporation v. USA                                    6/22/2017

1    themselves when we try to figure out what does this --
2    what do these contracts mean because when you look --
3              THE COURT:  These are the questions you had on
4    your reply to the Government's -- it was the list of
5    questions.
6              MR. WIGGIN:  Right, right.
7              THE COURT:  Yes, I've read those.
8              MR. WIGGIN:  And I think if you look at the
9    good faith and fair dealing -- and I have to say, I have
10   read -- I had done some research and I had read this law
11   before I drafted the complaint and I did a real -- I made
12   a real effort to put allegations in the good faith and
13   fair dealing paragraphs about things that were not merely
14   duplicative of contractual performances required by the
15   Space Act Agreement itself.  I tried to allege things
16   that were not in the express terms of the contract, but
17   that fell in with the Federal Circuit and the Court of
18   Federal Claims doctrine of good faith and fair dealing.
19              Now, I have to say that having studied that a
20   bit, I have to sort of paraphrase the words of Justice
21   White in the obscenity cases and say, I don't really know
22   what obscenity is, but I know it when I see it.
23              THE COURT:  I think it was Potter Stewart
24      MR. WIGGIN:  That's right, it was Potter Stewart,
25   I'm sorry.  I knew it was a Sixth Circuit judge, but --

1     it was Potter Stewart, I'm sorry.

2              But you get my point.  If you read enough of

3     the Federal Circuit cases, you sort of -- and you try to

4     put them all together and reconcile them with each other,

5     you know -- and by the way, I noticed that the -- on that

6     issue, Ms. Rose invoked the Metcalf case, the trial court

7     in the Metcalf case, which the Metcalf Federal Circuit

8     decision found that the trial judge had incorrectly

9     applied the case law -- the rules that were stated in

10    Precision Pine because Precision Pine, which the Metcalf

11    court said that's a special case, but that was the one

12    where they talked about depriving -- reappropriating the

13    benefit that the contract was supposed to bestow upon the

14    other party.

15             And it wasn't enough that the Government acted

16    to reappropriate those benefits, but they had -- you had

17    to show that they specifically targeted the other party

18    for that -- for that action.  And the trial judge in the

19    Metcalf case applied that rule and said, well, there was

20    no specific targeting here.  Yes, they did -- I guess you

21    could say that they reappropriated some stuff, but

22    there's no specific targeting here or evidence of any ill

23    will, and so I'm going to find that there was no breach

24    of the duty of good faith.  And the Metcalf court said,

25    no, you've got this wrong.

Spectre Corporation v. USA                                    6/22/2017

1           The Precision Pine court did not intend that
2    that is the entire rule of good faith and fair dealing.
3    It's just something that they pointed out that fit the
4    specific facts that were raised by that case, which you
5    might recall involved a different government agency
6    enacting some rules that prevented Precision Pine from
7    logging, and so they wanted to blame it all on the
8    whatever -- the Bureau of Land Management or whoever gave
9    them the logging rights.  And the Court said, basically,
10   well, it wasn't their fault, the Government didn't
11   specifically do this to screw Precision Pine, that was
12   just something that happened, so we're not going to let
13   you make the claim.  Anyway, the Metcalf case
14   straightened it out.
15           But let me just say that I'm not sure exactly
16   what this all means.  Now, to listen to the Government's
17   briefs -- and I think she sort of suggested this today --
18   this disclaimer of warranties -- oh, I'm mixing up
19   subject matters.
20           But consistent with Metcalf, I think you have
21   to say that it's something besides this -- you don't even
22   have to have this specific evil intent on the part of the
23   Government to find that they failed to comply with their
24   duty of good faith and fair dealing.  In fact, the Courts
25   have all pointed out that not acting in good faith is

1    different from acting in bad faith.  And we're not
2    suggesting -- well, I don't know, Dr. Okojie may have
3    acted in bad faith.  I won't say NASA did all by itself.
4            But in looking at these things, I think you
5    have to ask yourself a number of questions.  One is would
6    a tiny family business risk everything, as my client did,
7    if they didn't think NASA would deliver on these
8    promises?  They say it's a gratuitous contract.  Would a
9    tiny family business have agreed to pay NASA nearly
10   $500,000 in state grant funds without expecting anything
11   in return?  Because that's what they tell you.  We don't
12   really have any duties under this contract.  This is
13   illusory.
14           Would a tiny family business agree to spend
15   $1.5 million of its own money if it expected nothing?
16   Because in the end, they had to spend -- in the end, they
17   committed to spend $3 million here to be reimbursed a
18   million.  $500,000 of it was going to NASA.
19           Would they risk all of their good business
20   relationships that they had by promising all these
21   customers all over the world and distributors, we're
22   going to deliver space-age technology to you and it's
23   going to change -- it's going to change everything about
24   pressure sensor technology?  Would they make those
25   promises to people if they didn't think NASA was going to

Spectre Corporation v. USA                                    6/22/2017

1    actually deliver this stuff?

2              Would the State of Ohio have agreed to put a

3    million dollars of taxpayer money into an R&D project

4    that wasn't going to result in anything happening?  I

5    told you that they made NASA tell them, yes, this is

6    real.

7              Would a tiny family business enter into a

8    patent license agreement agreeing to pay $50,000 for

9    patent licenses that it couldn't do anything with?

10             Would they commit to paying $5,000 a year

11   through 2025 for minimum royalties when they might not be

12   able to make any money at all?  Or did they think that

13   NASA would ever take all this money and then terminate

14   the license agreement on the grounds that, well, Spectre

15   can't commercialize the technology?

16             THE COURT:  Mm-hmm.

17             MR. WIGGIN:  When the reason Spectre could not

18   -- and I would submit when we're talking about bad --

19   fair dealing and good faith, that the Courts do recognize

20   -- and this, again, is kind of a fuzzy sort of doctrine.

21   But if the Government does something to interfere with or

22   frustrate the other side's ability to perform the

23   contract and get the benefit of the contract, that is not

24   acting in good faith and that's not fair dealing.  And

25   that's why I allege that wrongfully -- you know, they

Spectre Corporation v. USA                                    6/22/2017

1    acted by the letter of the termination agreement in the

2    license agreement by terminating.  But when they're the

3    ones who brought about the circumstances that allowed

4    them to exercise that right of termination, that is not

5    good faith and fair dealing.

6              The question that all of those -- the answer to

7    all of those questions is no.  None of that would have

8    happened because Spectre wouldn't have done any of that.

9    The State of Ohio wouldn't have done -- wouldn't have

10   granted the money if they thought that none of this would

11   happen.  And the Government would say, well, that's

12   stupid, that's their own problem, freedom of contract.

13   If they want to make a bad contract, you know, so be it.

14   That's -- none of this is really relevant.

15             And it is really relevant because if there's

16   any doubt in your mind about what any of these things

17   mean -- and in judging good faith and fair dealing,

18   you have to look at the intent of the parties and what

19   they -- what the basis of the bargain was and what they

20   expected to get and if there's any doubt or ambiguity as

21   to what any of these things mean, you can look at

22   extrinsic evidence and you can look at the context of the

23   deal, and there's no integration clause.  This fancy

24   computer program that they have to (inaudible) this

25   boilerplate and it doesn't have an integration clause.

Spectre Corporation v. USA                                    6/22/2017

1                    THE COURT:  Right.

2                    MR. WIGGIN:  So you're free to do all that.

3                    Now, let me talk a little bit about the waiver

4       of express warranties.

5                    THE COURT:  Why don't we --

6                    MR. WIGGIN:  Take a break?

7                    THE COURT:  How long are you going to -- do you

8       anticipate being?

9                    MR. WIGGIN:  I better accelerate.  I've said a

10      lot of stuff out of order, but I can try and focus on the

11      remainder of it.

12                   THE COURT:  What's your estimate of how --

13                   MR. WIGGIN:  Forty-five minutes maybe.

14                   THE COURT:  Forty-five minutes.

15                   MR. WIGGIN:  Of course she reserved all of her

16      -- a lot of time to respond to all of this.

17                   THE COURT:  Yeah, so -- well, if we're going to

18      go 45 minutes --

19                   MR. WIGGIN:  Maybe I can do it in less time

20      than that.

21                   THE COURT:  Let's go on for ten more minutes

22      and see.

23                   MR. WIGGIN:  Okay.  Disclaimer of warranty.

24      Well, as you've heard from counsel, apparently, the

25      Government's interpretation is that we really haven't

1   promised to do anything because the disclaimer of

2   warranty says that anything we provide or anything we

3   agree to do is taken as-is.  And I'm not really sure what

4   that means when it applies to services.  I'm not sure

5   what that means as applied to anything else.

6          I mean, I -- when I think of as-is, I think of

7   a used automobile.  And the thing about taking a used

8   automobile as-is is you don't get a warranty.

9   Nobody's -- the seller shows up, he shows you the car.

10  You say, well, that's kind of rusty, the tires are kind

11  of bald, it's got a bunch of miles on it, you sure it

12  runs well?  Oh, yeah, it runs like a dream.  But it's as-

13  is.  And if you decide to accept it, okay, this is

14  acceptable meaning you take it.

15         Now, we didn't have any opportunity to look at

16  anything.  All we could rely on were the representations

17  that were made to us months and months before we signed

18  this contract.

19         THE COURT:  Mm-hmm.

20         MR. WIGGIN:  But this is NASA's boilerplate on

21  disclaimer wording.

22         THE COURT:  Right.

23         MR. WIGGIN:  This is something they put in

24  every single contract that disclaims everything about

25  everything they do.  And, apparently, what I'm hearing

Spectre Corporation v. USA                                    6/22/2017

1    from the Government is you had no right to expect

2    anything from us about anything.  And that's why I made

3    up the blueberry muffins and singing the school fight

4    song.  I forgot to put in my brief that the school fight

5    song was -- I was -- that was supposed to be a substitute

6    for the technology transfer.  And the Government's

7    response is, well, we're not admitting that the fight

8    song is not transfer of technology, but even if it is,

9    you can't complain about it.

10           Now -- and Ms. Rose said, well, I guess the

11   duty of good faith and fair dealing would apply.  But

12   we've also heard from them that that doesn't mean

13   anything because you can't -- the duty of good faith and

14   fair dealing, they tell you, cannot substitute for

15   anything that's in the contract.  So if the contract says

16   there's no warranties and that, you know, you can't

17   expect that you're getting anything, then how can they

18   say, well, we've got to act in good faith and we won't

19   come over with a plate of blueberry muffins?

20           But what we intend to prove in this case is

21   that it might as well have been a plate of blueberry

22   muffins and the technology transfer might as well have

23   been the school fight song because neither one of them

24   did us any good and neither one of them accomplished any

25   of the benefit that was supposed to -- that the parties

Spectre Corporation v. USA                          6/22/2017

1    bargained for in this contract.

2          Okay.  That's about the disclaimer of

3    warranties.  I also wanted to say one other thing about

4    that.  I hadn't really thought about this when the

5    Government came up with a motion because in all my years

6    of commercial litigation, I've seen -- anybody who's done

7    this has seen lots of cases where on the back side of a

8    contract, there is -- on the front side, there's all

9    sorts of promises made, all sorts of specifications, of

10   warranties, and on the back side, there's a boilerplate

11   disclaimer that says, we don't make any warranties.

12          THE COURT:  Mm-hmm.

13          MR. WIGGIN:  And it occurred -- I mean, I've

14   never been in a case where anybody really paid much

15   attention to that.  So but I started thinking about the

16   nature of all these things a lot more when this came

17   along and it occurred to me that the purpose of these

18   disclaimers of warranties is actually to be used in a

19   contract where the seller has no intention of making any

20   warranties, where they really don't have an intention of

21   making any warranties and they don't make any warranties

22   or promises.

23          And the purpose of the disclaimer is not to

24   nullify promises that they make and representations that

25   they make and warranties that they make expressly; the

Spectre Corporation v. USA                                    6/22/2017

1      purpose of the disclaimer is to make sure that some

2      lawyer doesn't show up down the road and say, well, other

3      language in the agreement -- I know that you didn't say

4      this, but other language in the agreement amounted to

5      that and these other oral statements that were made

6      amounted to that.  That's the purpose of a disclaimer of

7      express warranties because, otherwise, what sense does it

8      make that you've got a disclaimer of express warranties

9      when everybody can read on the front side of the contract

10     that you make express warranties.

11             And that's why, as I say in the brief,

12     generalia specialibus non derogant, the general cannot

13     detract from the specific.  So when NASA makes a bunch of

14     representations about how we will design 1000 PSI sensors

15     for you, we will do this, we will do this, we will do

16     that, they can't vitiate it with a boilerplate thing on

17     the back that says, well, we don't do any of that.

18             THE COURT:  Okay.

19             MR. WIGGIN:  Now, what about implied

20     warranties?  It's kind of a weird thing to think that you

21     could have a disclaimer of implied warranties -- that you

22     could actually have implied warranties that survive a

23     disclaimer of implied warranties.  But the more I think

24     about that, I think, why not?  I mean, merchantability --

25     there are only two implied warranties.  One is

1   merchantability.  NASA said, well, we're not merchants.

2   We put people on the moon.  We don't sell -- we don't

3   design and sell stuff.

4           But, actually, the definition of a merchant

5   under the UCC, which they quote, by the way, even though

6   they say I'm somehow -- you know, it's wrong to quote the

7   UCC in this court because federal law applies.  But the

8   definition of express warranty -- I mean, if a merchant

9   is a person who deals in goods of the kind or otherwise,

10  by his occupation, holds himself out as having knowledge

11  or skill peculiar to the practices or goods involved in

12  the transaction.

13          Dr. Okojie here had been working on these

14  things for over 20 years.  He's got a Ph.D.  I mean, he

15  speaks at international conferences, local conferences.

16  He's the Willy Wonka of silicon carbide.  And if anybody

17  qualifies as a merchant under that definition, it's Dr.

18  Okojie, and by virtue of him, NASA does, too.  And they

19  were acting as a merchant in this case.  The whole

20  purpose of this contract was to commercialize this stuff.

21          THE COURT:  Mm-hmm.

22          MR. WIGGIN:  And so it should have been implied

23  by the circumstances, without the contract saying

24  anything, that there was a warranty of merchantability,

25  which means when you get this stuff from me, we know that

1   you're going to sell it to somebody else and it's going

2   to work.  It will be merchantable.  Your seller isn't

3   going to sue you for fraud because the darn thing doesn't

4   work.

5            All right.  That gets us to the -- the

6   limitation on damages.  And as I -- what I have to

7   say about that is there is no -- NASA knows full well,

8   as you can tell from all these clauses, how to exclude

9   something if they want.  I gave you Article 8.  Article 8

10  is liability and risk of loss.  And in there, Spectre

11  waived the right to make any claim in the future for

12  any injury or death that was caused to anybody.  This was

13  all about personal injury or damage to property as a

14  result.

15           So this is a complete waiver of any claims.

16  You can't make a claim so you don't even have to talk

17  about damages.  But it says you can't get damages either.

18  So they know how to do that.  And my position is is that

19  there -- you will find nothing in this contract like

20  Article 8 which says that for business losses that arise

21  out of NASA's failure to perform this contract, that

22  Spectre waives all rights to make a claim and they can't

23  sue you.  There's nothing that limitates -- that limits

24  them in the damages that we can sue for.  And NASA knows

25  how to do that.

Spectre Corporation v. USA                                    6/22/2017

1           And I will point to Article 18, which is the
2      right to terminate -- I've given you a copy.  If you'll
3      look down in paragraph 3.  NASA shall not be liable for
4      any costs, lost profits, revenue, direct or consequential
5      damages, or anything as a result of the termination by
6      NASA pursuant to paragraph 1 of this section.  Now, that
7      doesn't apply -- that only applies when they terminate
8      the agreement, which they didn't do here.  Why did they
9      have to put that in Article 18?
10          The reason they had to put it in Article 18 was
11     that there's nothing else in the contract that says you
12     can't sue us for lost profits, you can't sue us for
13     consequential damages.  So they put it in here to make
14     sure that if NASA terminated the agreement, it could do
15     so without having any fear of being sued for lost profits
16     or consequential damages.
17          When I look back at Article 14, Disclaimer of
18     Warranties, which we were just talking about, and that
19     has in it the only other language in this contract that
20     you will find that bars my client from suing them for
21     consequential damages.  And that's down at the very end.
22     We don't know what this means.  It apparently applies to
23     everything, but the last sentence says, "Neither the
24     Government or its contractors shall be liable for
25     special, consequential or incidental damages attributed

Spectre Corporation v. USA                                    6/22/2017

1    to such -- attributed to" -- forget that other

2    language -- "to services provided" -- (inaudible) -- "or

3    resulting products made or developed under as a result of

4    this agreement."

5              Now, why did they put this in here?  They put

6    it in here because nowhere else in this contract except

7    for the termination clause will you find anything that

8    limits the right to sue for damages.  So they put it in

9    here.  And I maintain that this can apply only in the

10   case of damages arising from a breach of warranty, which

11   I argue this boilerplate does not preclude us from

12   making.

13             I think I've probably talked enough about good

14   faith and bad faith.

15             THE COURT:  Mm-hmm.

16             MR. WIGGIN:  Yeah, just one more word on the

17   essence of the bargain -- I guess I've talked about that.

18   I didn't mention, we -- the damages that we're seeking

19   here, $45 million -- and I don't know if we can actually

20   prove to the Court that we're due that -- but I will tell

21   you that the way that we've arrived at that figure -- and

22   we will put on evidence to flesh it out, but the process

23   we used was that we took -- in the business plan that was

24   put together with NASA and approved by NASA that was

25   submitted to the State of Ohio -- we had to have a

Spectre Corporation v. USA                           6/22/2017

1    business plan -- and what it showed was that once this

2    got underway, we would ramp up before year five from $18

3    million to $25 million a year in sales.

4              THE COURT:  Mm-hmm.

5              MR. WIGGIN:  So what we did was -- I think that

6    maybe that -- that might have been a little aggressive.

7    I don't know.  If NASA had delivered us something that

8    had worked and we could get it right out, maybe that

9    would have happened.  But to be conservative, what we did

10   was we ramped it up and then we assumed no further

11   growth.  We're going to expand the plant to get that

12   done; we're going to hire more people; we're going to pay

13   for more machines and materials.  But after that point,

14   we're going to assume no further growth.  We're not going

15   to keep that ramp going up.

16             So we assumed that through 2025, we would have

17   -- that's just the amount of gross we would have per year

18   for the rest of the years.  And then we took the profit

19   margin we expected and we calculated that our profit

20   would be $45 million.  And based on those gross sales,

21   which would be a total of about $250 million through

22   2025, NASA's cut would be $15 million on their royalty.

23   So that's what they expected to get out of this, and I

24   think they really did expect it.

25             So I apologize for sort of going all over the

Spectre Corporation v. USA                                    6/22/2017

1     place here, but I hope I -- I hope I've answered all your

2     questions and --

3               THE COURT:  Yes.

4               MR. WIGGIN:  -- if not, I'm certainly free to

5     answer them.

6               THE COURT:  Okay.

7               MR. WIGGIN:  I'll sit down now.  Thank you.

8               THE COURT:  Okay, thank you, Mr. Wiggin.

9               Ms. Rose, what do you anticipate in terms of

10    time?

11              MS. ROSE:  I don't have much.  I think I can

12    wrap up in less than five minutes.

13              THE COURT:  Okay, good.

14              MS. ROSE:  The reason I think I can be brief is

15    because I'm going to bring it back to the arguments that

16    are actually at issue and what the Court needs in order

17    to grant the Government's motion to dismiss.

18              At the beginning of Mr. Wiggin's presentation,

19    the Court asked is there any obligation of NASA to

20    perform without payment.  There is not.  The Plaintiffs

21    have acknowledged that they didn't make that payment that

22    was required prior to the work of Milestone 3.  And

23    although they talked about what they would have liked

24    NASA to have delivered, there was no delivery required

25    under the contract until Milestone 6 for the sensors and

Spectre Corporation v. USA                                    6/22/2017

1    Milestone 5 for certain information.

2            The milestones are clearly outlined in Exhibit

3    2.   The -- in Article 3B, the number of paragraphs track

4    the milestone schedule and then Article 4 has the

5    milestone schedule itself.

6            In addition, what we haven't heard is anything

7    that would demonstrate that the disclaimer of liability

8    and damages here didn't apply.  I think Plaintiff's

9    primary argument is that this was boilerplate, but simply

10   by labeling something "boilerplate" doesn't eliminate an

11   enforceable contract provision.

12           The -- oh, one more thing I wanted to know on

13   NASA's performance.  If they weren't being paid, there

14   was a limit on what they could do and this is outlined in

15   Exhibit 2 under Article 5 in paragraph 5 that talks about

16   NASA's inability to expend funds if it's going to run

17   into an Anti-Deficiency Act problem.  So to the extent

18   that Spectre isn't paying, NASA can't spend that money

19   itself because it would be in violation of the Anti-

20   Deficiency Act.

21           THE COURT:  Mm-hmm.

22           MS. ROSE:  One thing that Plaintiff appeared to

23   be confused about was the Government's discussion of when

24   -- when the disclaimers of liability and damages wouldn't

25   apply and my earlier reference to bad faith.  That was

Spectre Corporation v. USA                                    6/22/2017

1    not a reference to the -- to the duty of good faith and

2    fair dealing.  We recognize the distinction.  And I think

3    that Plaintiff acknowledged in their presentation that

4    they're not actually alleging bad faith, and we think

5    that's consistent with their complaint.

6          The one thing that I would say about the duty

7    of good faith and fair dealing is that it cannot, of

8    course, expand the parties' contractual duties or create

9    duties inconsistent with the contract provisions, and

10   that includes altering the contract's discernable

11   allocation of risks.  And this was a contract where there

12   was a very clear allocation of risk and the allocation

13   was to put the risk on Spectre.

14         And if the Court does not have any further

15   questions, then we will rest on our briefs.

16         THE COURT:  Okay.  Thank you very much, Ms.

17   Rose and Mr. Wiggin.

18         MR. WIGGIN:  Well, if you'd like, just another

19   two minutes --

20         THE COURT:  No, I --

21         MR. WIGGIN:  You wouldn't?  Okay.

22         THE COURT:  I think I've heard a lot of useful

23   information.  At least I'll give you the way I am leaning

24   at the moment, which may help counsel in terms of

25   settlement.  I think this is a complex relationship that

 1   requires an answer to some fact questions about the whole
 2   transaction on which good faith hinges.  I mean, both
 3   counsel agree that if NASA had not really performed over
 4   the blueberry muffins example, then that would be a good
 5   faith violation.  Every contract has to have some
 6   meaning, otherwise, it's not a real contract, with some
 7   obligations it imposes.  That's the nature of the
 8   contract relationship.
 9           And if that's the case, as we -- I'm thinking
10   I'm going to look more at the materials and analyze in
11   greater detail what I've heard today.  It seems that a
12   trial would be necessary and I have to -- I would have
13   to, in that case, deny the Government's motion to
14   dismiss.
15           And the facts that I've also heard and seen in
16   -- through the briefs -- I've read through the briefs --
17   it's a complex transaction that was clearly going to be
18   added for reasons that were not completely clear.  Some
19   may have related to NASA, some may have related to the
20   expectations of dealing with the Government.  Small
21   businesses often don't realize the complexities that
22   exist.  And this one is like complexity raised to another
23   order of magnitude because of the involvement of a state
24   entity as well as a federal entity.  And so all of that
25   creates a complex business relationship, that if the

Spectre Corporation v. USA                                    6/22/2017

1   Court is going to obviously do justice in the case and

2   follow what the law requires, has to be understood.  And

3   to the extent good faith seems to be an integral part of

4   the dispute, that has to be -- that's a fact question

5   that requires witnesses.

6          I'd add one thing, also, which may help in

7   terms of an attempt to settle this case.  When we have

8   relationship cases as opposed to clear legal principle

9   cases, settlement is always a better option.  It seems to

10  me that the $45 million claim isn't anywhere near likely

11  to succeed simply because it's speculative.  The rule has

12  generally been when you're looking at business lost

13  profits, these have to be existent profits.  They have to

14  have had a track record.  New profits are virtually

15  never, that I can remember, granted, future expected

16  profits for a new venture.

17         So with that in mind, that may give some kind

18  of guidance to the value in the case.  But I would

19  definitely like to see discussions about settlement.  And

20  then I'll probably be able to get a ruling out in the

21  next week on the motion, whether I will or will not

22  dismiss it.  But in the meantime, given my discussion,

23  I'd like to schedule a telephone conference where the two

24  of you can -- the two sides can discuss this together.  I

25  know, obviously, you have to discuss it with other people

Spectre Corporation v. USA                          6/22/2017

1   who are not in the courtroom first and so I don't know
2   what a reasonable -- do we have a calendar?
3              MR. WIGGIN:  Judge --
4              THE COURT:  Okay, thank you.
5              MR. WIGGIN:  -- I should say that I did bring
6   this up from the beginning, and when I first talked to
7   Mr. Gwynne, he was not up to speed and he had to talk
8   with lots of people in NASA and I understand how
9   difficult that must be for the Justice Department.  And,
10  of course, by the time he got up to speed, he filed the
11  motion.  And then he left, and I talked to Ms. Rose about
12  it.  But I do agree that -- and I've said all along --
13  that we would like to sit down and try to work things
14  out.
15             THE COURT:  Would a reasonable date for our
16  status conference be the 27th of July?  Because that
17  would give you -- both sides a chance to discuss this
18  internally and then have a status conference at least to
19  -- I don't expect anything to be done by the status
20  conference, but I would like to at least get a
21  temperature reading.  I don't have the sensors for that,
22  but I --
23             MS. ROSE:  Your Honor, I will be out for the
24  next two weeks, so there won't any initiation on that for
25  the Government until July 10th.

1                    THE COURT:  The 27th would be --

2                    MS. ROSE:  It would be --

3                    THE COURT:  -- feasible?

4                    MS. ROSE:  It would be okay, but I'll only have

5     a few weeks before that.  So (inaudible) on what we would

6     be able to accomplish.

7                    THE COURT:  Okay.  Why don't we just then

8     see when we're able to get it together.  I think we

9     should have a target date that's within reason.  So let's

10    say the 27th will be a status conference on the

11    telephone.  Let's see when we -- we can put it at 2:00

12    and then move (inaudible) to 2:30.  And at that point,

13    as I said, if I had a high pressure sensor, I would use

14    it to determine the pressure and the temperature.

15    But subjectively I would get a sense from each of you

16    as to what the likelihood of proceeding would be, and in

17    the meantime, think, you know, what a -- if settlement is

18    not in the cards, at least start thinking about a trial

19    date.

20                   So I'll see you all or talk to you all on the

21    27th at 2:00.  And we'll consider the Government's motion

22    and take that under advisement for now and we'll give you

23    a short -- in a short time, the decision.  Thank you both

24    for your very useful -- both your oral arguments and your

25    briefs to the Court in this case, and I look forward to

84

Spectre Corporation v. USA                                    6/22/2017

    1    talking to you again.
    2                    MR. WIGGIN:   Thank you, Your Honor.
    3                    (Whereupon, at 4:16 p.m., the hearing was
    4    adjourned.)
    5
    6
    7
    8
    9
   10
   11
   12
   13
   14
   15
   16
   17
   18
   19
   20
   21
   22
   23
   24
   25

Spectre Corporation v. USA                                      6/22/2017

```
 1                    CERTIFICATE OF TRANSCRIBER

 2

 3          I, Elizabeth M. Farrell, court-approved

 4   transcriber, certify that the foregoing is a correct

 5   transcript from the official electronic sound recording

 6   of the proceedings in the above-titled matter.

 7

 8

 9

10   DATE:   1/17/2018            S/Elizabeth M. Farrell

11                                ELIZABETH M. FARRELL, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```